## UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| In re: Jose Juan Ruvalcaba, | ) | **Bankruptcy No. 16-82572** |
| | ) | |
| _____ Debtor. _____ | ) | **Adversary No. 16-96071** |
| Joseph D. Olsen, Trustee for the | ) | |
| Estate of Jose Ruvalcaba, | ) | **Chapter 7** |
| Plaintiff, | ) | |
| v. | ) | **Judge Lynch** |
| Sara Ruvalcaba, | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

The Plaintiff Chapter 7 Trustee seeks through his adversary proceeding against the Debtor's non-filing spouse, Sara Ruvalcaba,[1] to avoid the pre-petition transfer of the Debtor's ownership interest in certain commercial real estate. The Debtor, Jose Juan Ruvalcaba, purportedly effected this transfer by a quit claim deed in the real estate located at 730 East Lincoln Highway, DeKalb, Illinois (the "DeKalb Property") signed by the Debtor on November 16, 2012, and recorded on January 7, 2013.

The trustee's complaint originally asserted five counts, all seeking to avoid or recover on the same transfer of the DeKalb Property. Pursuant to the Bankruptcy Code's grant to the trustee of certain powers of avoidance under applicable state law, 11 U.S.C. § 544(b), Counts I, II and III seek to avoid the transfer under, respectively, sections 5(a)(1), 5(a)(2) and 6(a) of the Uniform Fraudulent Transfer Act as adopted

---

[1] For clarity, the Defendant and the Debtor sometimes will be referred to by their first names.

in Illinois. 740 Ill. Comp. Stat. 160/5(a)(1), 160/5(a)(2) and 160/6(a). Count V seeks recovery of either the property itself or a money judgment for the value of the property pursuant to Section 550(a) of the Bankruptcy Code. The court previously dismissed Count IV, which sought avoidance under 740 Ill. Comp. Stat. 160/6(b), on March 8, 2017, on the Defendant's motion to dismiss.

Before the court are the parties' cross-motions for summary judgment, which have been fully briefed and argued. (ECF Nos. 20, 24.) For the reasons set forth below, summary judgment will be entered in favor of the trustee on Counts I, II, III, and V of the Adversary Complaint and the Defendant's motion for summary judgment will be denied.

## JURISDICTION

There is no dispute that both the Debtor and the Defendant are and were at all relevant times residents of Illinois and that the property at issue is in this state. The trustee seeks to recover this property for the estate through the avoidance powers granted by Section 544(b) of the Bankruptcy Code. These matters are "proceedings to determine, avoid, or recover fraudulent conveyances" and therefore designated as "core proceeding[s]" by 28 U.S.C. § 157(b)(2)(H). As such, each of Counts I through V is a matter which arises under title 11. In addition, the Fed. R. Bankr. P. 7056 motions relating to these claims are also core proceedings. 28 U.S.C. § 157(b)(1) and (b)(2).

These related matters are therefore within the "original but not exclusive" jurisdiction of the federal district courts pursuant to 28 U.S.C. § 1334(b). Pursuant

to 28 U.S.C. § 157(a) the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).   Additionally, both parties have formally consented to entry of final judgment by this court in these matters. (See Trustee's Statement of Undisputed Material Facts ("Pl. LR 7056-1") ECF No. 22, ¶ 3; Def. LR 7056-2 Resp., ECF No. 23, ¶¶ 2-4.)

Accordingly, final judgment is within the scope of this court's jurisdiction and constitutional authority.

## FINDINGS OF FACT

From its review of the complaint, answer and motions, the parties' respective statements of undisputed facts and responses, and supplemental statements of fact, the court finds the following facts to be undisputed.

Sara and Jose Ruvalcaba are wife and husband married for more than twenty years and during all times relevant to this action. (Def. LR 7056-2 Resp., ¶¶ 9-10.) The Debtor purchased the DeKalb Property for $125,000 on or about September 1, 2005. (*Id.* ¶ 15.) He financed the purchase in part by borrowing $75,000 from a bank to whom he granted a mortgage in the property. (*Id.* ¶¶ 16-17.) Sometime prior to November 2012, the mortgage was paid off in full and as of that time the Debtor was the sole owner of the DeKalb Property. *(Id.* ¶¶ 18-19, 22.)

On November 16, 2012, Jose executed a quit claim deed transferring the DeKalb Property to Sara. (*Id.* ¶ 20.)  The quit claim deed was recorded with the DeKalb County Recorder's Office on January 7, 2013. (*Id.* ¶ 21.)  No physical assets

or cash were exchanged in consideration for the transfer.[2]

Prior to the transfer, the Debtor had operated his used car dealership commonly known as DeKalb Auto Sales out of the DeKalb Property. (Def. LR 7056-2 Resp., ¶ 11.)  He continued to operate the business out of the property for approximately a year after the transfer. (*Id.* ¶¶ 11, 25.) While the Defendant alleges that she rented the property to Jose during this time, she admits that there was no written lease agreement and that the Debtor never actually paid any rent. (ECF No. 22, Ex. C, hereinafter "Sara Depo." 119:11, 16.)

At the time of the transfer, the DeKalb Property was the Debtor's most valuable asset. (Def. LR 7056-2 Resp. ¶ 41.) On May 1, 2015, the Defendant entered into a lease agreement with an individual named Miguel Fernandez to lease the DeKalb Property to him for $13,200 per year. (*Id.* ¶ 44.) On June 25, 2015, Sara listed the DeKalb Property for sale with a list price of $129,000. (*Id.* ¶ 43.)

The Debtor was not making the required monthly payments for and in connection with the floor plan financing for his used car business at the time of the transfer. (Def. LR 7056-2 Resp.¶¶ 36 - 38.) On or about December 28, 2012, less than two months after the transfer, the floor plan financer repossessed the vehicles constituting its collateral. (*Id.*) Earlier in the year, on February 16, 2012, an order of possession was entered in a foreclosure proceeding commenced in 2010 on a residential property in DeKalb that the Debtor owned and rented. As of the time of the DeKalb Property transfer, Jose and Sara were having difficulty making home

---

[2] As discussed below, the Defendant asserts but has failed to meet her burden of establishing a genuine dispute that the transfer was in payment or satisfaction of an antecedent debt.

mortgage payments to Chase Bank and stopped making such payments in November 2012. (*Id.*, ¶¶ 86-87.) Jose advised Sara at the time of the DeKalb Property transfer "that he was going to file for bankruptcy." (*Id.* ¶ 90.)

The Debtor filed a petition under Chapter 13 of the Bankruptcy Code on October 22, 2013. (*Id.* ¶ 49.) In the schedules filed with the petition, Jose listed the transfer of the DeKalb Property, describing it as "Quit Claim Deed: 730 E Lincoln Highway, DeKalb, IL 60115 (location of Debtor's business DeKalb Auto Sales); Value received $0.00; approximate value of property is $30,000; Prepared 11/16/12; Recorded 01/07/2013." (*Id.* ¶ 31.[3]) The 2013 Chapter 13 case was dismissed on January 9, 2015, prior to confirmation of any plan.[4]

The Debtor filed his voluntary petition in this Chapter 7 case on October 31, 2016. The trustee filed his adversary complaint against Sara on December 28, 2016, the same day he filed an initial report of assets in the bankruptcy case. Prior to the claims bar date of March 31, 2017, creditors (not including the Defendant) had filed thirteen proofs of claim, asserting unsecured claims totaling $79,589.38. Among these were proofs of claim for Automotive Finance Corporation ("AFC") of $42,446.12 (Claim 10); Chase Bank USA of $3,953.50 (Claim 13); Von Maur of $216.36 (Claim 7); Discover Bank Discover Products, Inc. of $11,729.34 (Claim 4); Discover Bank Discover Products, Inc. of $9,500.87 (Claim 5); and Discover Bank Discover Products, Inc. of $5,102.63 (Claim 6). (Def. LR 7056-2 Resp., ¶ 24.)

---

[3] In the trustee's LR 7056-1 Statement, he points to the description in the Debtor's Amended Statement of Financial Affairs filed September 30, 2014. But the description is identical in the Debtor's original Statement of Financial Affairs filed with the petition on October 22, 2013.
[4] The case was closed and Chapter 13 trustee discharged on March 25, 2015.

The Defendant filed a proof of claim in this case on March 31, 2017. It asserted an unsecured nonpriority claim of $138,396 for what she describes as "Business Loans." She did not attach any written agreements to support the alleged claim, instead attaching only copies of checks, bank statements and credit card statements, together with a summary of what she alleges to be payments made by her to or on behalf of the Debtor or his business between February 2002 and September 2016. There is and has never been any documentation that memorializes or states the terms of the alleged "business loans" between Jose and Sara. (*Id.* ¶ 64.) The summary attached to Sara's proof of claim does not include a credit in any amount for and in connection with the transfer of the DeKalb Property to her. (*Id.* ¶ 63.) The summary alleges without documentary support a $20,000 cash payment to DeKalb Auto Sales on February 1, 2002. The summary further alleges that checks totaling $44,231 were drawn on the Debtor and Defendant's joint checking account between 2002 and the date of the DeKalb Property transfer, that $17,198 in cash was withdrawn and $47,000 in funds were transferred out of the account during the same period. Attached to the summary are copies of checks and notices of transfers. The summary also alleges that charges totaling $8,000 were made on the Defendant's credit card between 2010 and October 2012. Credit card statements are attached to the summary. The summary also identifies further debits totaling $23,567.72 and credits totaling $21,600 between July 2013 and March 2016, labeling the credits as "rent payment."

From 2003 through 2013, the Defendant was employed as a cook at an

Applebee's restaurant. During this time her average annual income ranged between $27,000 - $28,000. (Def. LR 7056-2 Resp. ¶¶ 71-76.)

## DISCUSSION

### *Summary Judgment.*

The court shall grant a motion for summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), as incorporated by Fed. R. Bankr. P. 7056. "The party that bears the burden of proof for an issue at trial must 'cite the facts which it believes [would] satisf[y]' that burden and 'demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant ....'" *Bunch v. United States*, 880 F.3d 938, 941 (7th Cir. 2018) (quoting *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015)). "Once the moving party meets its burden, summary judgment is proper if the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Creditor's Comm. of Jumer's Castle Lodge, Inc. v. Jumer*, 472 F.3d 943, 946 (7th Cir. 2007) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

For purposes of summary judgment, a genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. We "consider all of the evidence in the record in the light most favorable to the non-moving party, and we draw all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018) (quoting *Feliberty v. Kemper Corp.*, 98 F.3d 274, 276–77 (7th Cir. 1996)). However, the court is "'not required to draw every conceivable inference from the record' in favor of the nonmoving party, but 'only those inferences that are reasonable.'" *United States v. Luce*, 873 F.3d 999, 1005 (7th Cir. 2017) (quoting *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991)).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." Bankr. N.D. Ill. Loc. R. 7056-2(B). If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes

of the motion or grant summary judgment if the motion and supporting materials··
including the facts considered undisputed··show that the movant is entitled to it. Fed.
R. Civ. P. 56(e). "[A] party will be successful in opposing summary judgment only
when they present definite, competent evidence to rebut the motion." *United States
v. Luce*, 873 F.3d 999, 1008 n.31 (7th Cir. 2017) (quoting *Smith v. Severn*, 129 F.3d
419, 427 (7th Cir. 1997)). A party "cannot thwart summary judgment by asking a
court to make inferences based on flights of fancy." 873 F.3d at 1008 n.31 (7th Cir.
2017) (quoting *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 508 (7th
Cir. 2010)). "Summary judgment is not a time to be coy: 'conclusory statements not
grounded in specific facts' are not enough" to stave off summary judgment. *King v.
Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Bordelon v. Bd. of Educ.
of the City of Chicago*, 811 F.3d 984, 989 (7th Cir. 2016)).

*Strong Arm Power.*

Here, the trustee seeks to avoid the transfer of the DeKalb Property to the
Defendant through the Illinois Fraudulent Transfer Act. Section 544(b) of the
Bankruptcy Code gives a trustee the power to "avoid any transfer of an interest of the
debtor in property or any obligation incurred by the debtor that is voidable under
applicable law by a creditor holding an unsecured claim that is allowable under
section 502 of this title or that is not allowable only under section 502(e) of this title."
This so-called "strong-arm" power "enables the trustee to do in a bankruptcy
proceeding what a creditor would have been able to do outside of bankruptcy—except
the trustee will recover the property for the benefit of the estate." *In re Equip.*

*Acquisition Res., Inc.*, 742 F.3d 743, 746 (7th Cir. 2014). In order for the trustee to utilize the power, there must exist an actual unsecured creditor that could have brought the state-law action, and the "trustee stands in the shoes of [such] actual unsecured creditor." *Id.* However, because the fraudulent transfer law permits any qualified unsecured creditor to avoid the transfer of property in whole, even if the trustee "cannot point to creditors whose claims total more than the value of the land, the [t]rustee can avoid the transaction entirely." *In re Leonard*, 125 F.3d 543, 544–45 (7th Cir. 1997). The trustee need not identify any particular creditor with such power "so long as the unsecured creditor exists." *In re Image Worldwide, Ltd.*, 139 F.3d 574, 577 (7th Cir. 1998). The "whole value of the asset then is distributed among creditors of the estate." *Leonard*, 125 F.3d at 544-45.

The underlying causes of action asserted by the trustee in Counts I and II give standing to any "creditor whether the creditor's claim arose before or after the transfer was made." 740 Ill. Comp. Stat. Ann. 160/5(a). In contrast, Count III grants standing only to "a creditor whose claim arose before the transfer was made." 740 Ill. Comp. Stat. Ann. 160/6(a). The statute defines a "Creditor" as any person who "has a claim," which in turn is broadly defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 740 Ill. Comp. Stat. Ann. 160/2.

The trustee has identified at least six creditors who filed proofs of claim in the Debtor's pending Chapter 7 case to assert unsecured claims which have not been

objected to: Automotive Finance Corporation ("AFC"), $42,446.12 (Claim 10); Chase Bank USA, $3,953.50 (Claim 13); Von Maur, $216.36 (Claim 7); Discover Bank Discover Products, Inc., $11,729.34 (Claim 4); Discover Bank Discover Products, Inc., $9,500.87 (Claim 5); and Discover Bank Discover Products, Inc., $5,102.63 (Claim 6). (Def. LR. 7056-2 Resp., ¶ 24.) The Defendant does not dispute these proofs or offer any objection to the claims themselves. Instead, she objects that none of the proofs of claim cited "clearly evidence a default by Jose prior to November 16, 2012, the date he signed the Quit Claim Deed to the Real Estate in favor of Sara." (Def. LR. 7056-2 Resp., ¶ 24.)

The language of the statute controverts this argument. Nothing in the Illinois Uniform Fraudulent Transfer Act requires a creditor to demonstrate a pre-transfer default. In addition, November 16, 2012 is not the correct measuring date. Only Section 160/6(a), not Section 160/5(a), requires a pre-transfer claim. And even for Section 160/6(a), the issue is not the date of a default, but rather whether a creditor has a "claim" which "arose before the transfer was made." As noted above, "claim" is broadly defined to include not only causes of action for defaulted loans, but also any matured, unmatured, disputed, undisputed, contingent or noncontingent right to payment whether or not reduced to judgment.

Additionally, the statute makes clear that the relevant date with respect to the transfer is not the date the transfer is effectuated as between the parties but rather the date such transfer becomes effective against third parties. For the purposes of the Illinois Uniform Fraudulent Transfer Act, a transfer is made "with respect to an

asset that is real property other than a fixture, but including the interest of a seller or purchaser under a contract for the sale of the asset, when the transfer is so far perfected that a good-faith purchaser of the asset from the debtor against whom applicable law permits the transfer to be perfected cannot acquire an interest in the asset that is superior to the interest of the transferee." 740 Ill. Comp. Stat. Ann. 160/7. Under the Illinois Transfer Act, all deeds "shall take effect and be in force from and after the time of filing the same for record, and not before, as to all creditors and subsequent purchasers, without notice; and all such deeds and title papers shall be adjudged void as to all such creditors and subsequent purchasers, without notice, until the same shall be filed for record." 765 ILCS 5/30. Thus, the relevant date is not the date the quit claim deed was signed, as the Defendant now would have it, but rather the date it was recorded: January 7, 2013.

While the Defendant is correct that some of the proofs of claim do not unequivocally state that the claim arose prior to that date,[5] others do. For example, the account summary attached to Claim 4-1 of Discover Bank for $11,729.34 indicates that the "date of last transaction on account (cash advance, balance transfer or purchase)" was October 9, 2012, and Claim 6-1 of Discover Bank for $5,102.63 indicates such date was December 19, 2012. Defendant is therefore incorrect to argue that none of the proofs of claim show that current unsecured claims existed prior to the transfer, and offers no admissible evidence to the contrary. The undisputed

---

[5] For example, claim number 10-1 of Automotive Finance Corporation attaches a copy of an Indiana judgment dated August 27, 2013, but neither the proof of claim nor the judgment give any indication as to when or how the claim for which judgment was granted arose.

existence of at least the two Discover Bank claims is sufficient to provide the trustee standing to maintain his state law claims under each of his Counts I, II and III.[6]

## The Illinois Uniform Fraudulent Transfer Act

The Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1, *et seq.*, provides creditors with a remedy to avoid transfers by a debtor which are fraudulent with respect to such creditor. 740 Ill. Comp. Stat. 160/8(a)(1). "Fraudulent conveyance law protects creditors from last-minute diminutions of the pool of assets in which they have interests. They accordingly need not monitor debtors so closely, and the savings in monitoring costs make businesses more productive." *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 892 (7th Cir. 1988).

**A.    Actual Fraud.** For purposes of the Illinois Uniform Fraudulent Transfer Act, a transfer is fraudulent as to both past and future creditors if the debtor made the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor." 740 ILCS 160/5(a)(1). A creditor must prove actual intent by clear and convincing evidence. *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 757 (7th Cir. 2012) (citing *Hofmann v. Hofmann*, 446 N.E.2d 499, 506 (Ill. 1983)). However, Section 160/5(b) of the Act sets forth eleven non-exclusive factors, known as "badges of fraud," from which an inference of fraudulent intent may be drawn:

---

[6] The timing of the claims is further corroborated by the Debtor's schedules filed in his Chapter 7 case, in which he describes the $5,102 claim of Discover Bank as "Opened 12/06 Last Active 12/18/12" and a $9,500 claim of Discover Bank as "Opened 09/00 Last Active 12/20/12." (Case No. 16-B-82572, ECF No. 5.) The Debtor listed several other unsecured claims in his bankruptcy schedules as having been incurred prior to January 7, 2013, but there were no proofs of claim filed in support of such claims and the Plaintiff did not reference or rely upon such alleged claims. The Debtor also scheduled the $3,954 claim of Portfolio Recovery for a transferred credit card debt from Chase Bank USA, N.A., listing the claim as having been "Last Active 07/12." However, the account summary attached to Portfolio Recovery's proof of claim number 13-1 lists a "Last Transaction Date" of January 27, 2013.

(b) In determining actual intent under paragraph (1) of subsection (a), consideration may be given, among other factors, to whether:

(1) the transfer or obligation was to an insider;
(2) the debtor retained possession or control of the property transferred after the transfer;
(3) the transfer or obligation was disclosed or concealed;
(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) the transfer was of substantially all the debtor's assets;
(6) the debtor absconded;
(7) the debtor removed or concealed assets;
(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

740 Ill. Comp. Stat. Ann. 160/5(b)(1)-(11). *See Dixon v. Ruth (In re Gluth Bros. Constr.)*, 424 B.R. 368, 375 (N.D. Ill. 2009). Illinois courts "routinely hold that the presence of a sufficient number of these 'badges' gives rise to a presumption of fraud." *Frank Ix & Sons, Inc. v. Phillipp Textiles, Inc.*, 165 F.3d 32 (7th Cir. 1998) (citing *Steel Co. v. Morgan Marshall Indus., Inc.*, 662 N.E.2d 595, 602 (Ill. App. Ct. 1996)). Badges of fraud "are not conclusive but are strong or weak, according to their number and concurrence in the same case." *Zwick v. Catavenis*, 162 N.E. 869, 872 (Ill. 1928). The badges are not "additive" and do not have equal weight, nor is there a set number which must be present to demonstrate fraud. *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 419 F.3d 594, 600 (7th Cir. 2005). Despite the presence of badges of fraud, the inference of fraud "may be overcome by evidence establishing the bona

fides of the transaction." *Zwick*, 162 N.E. at 872.

In his motion, the trustee contends that the uncontroverted facts of the case establish the existence of ten of the eleven statutory "badges of fraud." (Def. Mem., ECF No. 25, ¶¶ 16-23.) The trustee has demonstrated that there is no genuine issue of material fact that at least six statutory badges of fraud are present in the transfer of the Dekalb Property. While the trustee alleges that an additional four badges are also present, the court finds that he failed to demonstrate for purposes of Rule 56 that there is no genuine dispute as to those additional badges. Nonetheless, the six established badges of fraud, when given appropriate weight, are sufficient to create an inference of fraud supporting the entry of summary judgment in favor of the Plaintiff.

### *Badges 1 and 11: Transfer to Insider.*

It is undisputed that the Defendant is and at all relevant times was the Debtor's spouse. As such, Jose's action is a transfer to an insider, and the trustee has established the first badge of fraud. 740 Ill. Comp. Stat. 160/2(g) ("Insider" includes "a relative of the debtor"), (k) ("Relative" includes "a spouse").

The trustee also argues that the eleventh badge is established because "the essential assets of Jose's business was transferred to an insider." (Pl. Memo, ECF No. 21, p. 22.) In support, the trustee relies on the deposition testimony of the Debtor that "his only remaining business asset of value was the real estate which he transferred to Sara." (*Id.*) But in making this argument, the trustee seems to disregard the words "to a lienor who transferred the assets" in the statutory badge. 740 Ill. Comp. Stat.

Ann. 160/5(b)(11)("the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."). The trustee's reading of the statute would add little not already covered by badges one and five, and is inconsistent with the language of the statute.

In the same discussion, the trustee refers to the Debtor's sworn testimony during his examination: "Q. Did you have anything else of value to transfer to her [Sara]? A. No. Not even vehicles. The vehicles that I got in my car lot, they were floor plan. . .. I don't even have those cars. I don't have nothing. . .. They were repossessed, those vehicles, Exactly." (Jose Depo. Tr., ECF No. 22, Ex. D 22:7-19 ("Jose Depo."); Pl. Mem., ECF No. 21 at 21.) To the extent the trustee means to refer to the vehicles as the "essential assets" transferred to the floor plan financer as the "lien" for purposes of the eleventh badge, he has not alleged, let alone demonstrated, that those vehicles were in turn transferred to the Debtor's spouse. We fail to see and the trustee does not allege that undisputed evidence that the property transferred to Debtor's spouse occurred through an intermediate transfer of his business assets to a lienor.

### Badge 2: Continued Possession / Control.

It is also undisputed that the Debtor maintained possession of and continued to operate his business out of the DeKalb Property following the November 2012 transfer to at least November 1, 2013, nearly a year after the transfer and less than two weeks after the date of Jose's Chapter 13 petition. The Defendant attempts to explain away his continued possession by alleging that she had leased the property

back to Jose after the transfer. But Sara and Jose both testified during their Rule

2004 examinations that the Debtor never actually paid her any rent. (Jose Depo.

119:11, 120:4; Sara Depo. 65:5-6, 12-14.) The Defendant also admitted under oath

that "I don't have anything in writing" as evidence of the purported lease. (Sara Depo.

119:16.) Nor at any time during their examinations were either Jose or Sara able to

describe any terms of the supposed lease, not even the amount of rent. At most, the

Defendant provided only the general statement that "I let him stay. He said he would

pay rent, and he didn't." (*Id.* 120:2-4.) Sara claimed to have "evicted" the Debtor for

nonpayment of rent possibly a year after the transfer, but then admitted that she did

not "do a formal eviction proceeding" but rather "just told him to get out." (*Id.* 119:5-

6, 12-14, 120:1-3.) However, there is no evidence of anyone other than the Debtor

using or occupying the property until May 2015, when she stated she first entered

into a lease of the property to a third party. (Def. LR. 7056-2 Resp., ¶¶ 43, 44.)

The Defendant's assertion during her examination that the Debtor owed her

for unpaid rent after she rented to him the DeKalb Property is also inconsistent with

the March 31, 2017 proof of claim filed by Sara in the Debtor's pending Chapter 7

bankruptcy case. To it Sara attached a self-prepared summary in which she lists the

third-party rent she received in 2015 and 2016. Notably, while she lists the figures

for 2015 and 2016 as if they should be treated as partial payments of the Debtor's

obligations to her, she does not list any claim for unpaid rent due from the Debtor

between 2002 and 2016, the period covered by her summary. For these reasons, we

find that the Defendant has failed to raise a genuine dispute over the evidence that

demonstrates continued possession or control sufficient to establish that the property transfer is marked by the second badge of fraud. 740 Ill. Comp. Stat. Ann. 160/5(b)(2).

*Badges 3 and 7:  Concealment of Transfer or Assets.*

The trustee also argues that the record demonstrates that the transfer was concealed and that the Debtor concealed assets, invoking 740 Ill. Comp. Stat. 160/3(b)(3) and (7).  On the one hand, it is undisputed that the transfer of the DeKalb Property was made of public record when Jose recorded the quit claim deed with the DeKalb County recorder on January 7, 2013.[7] But unless a creditor monitored the land records, there would be no outward notice of the change in ownership because the Debtor continued to occupy and run his business from the premises for at least a year after the transfer, based solely, the Defendant contends, on a supposed undocumented agreement between her and Jose, an agreement for which she does not recall money actually changing hands.  Additionally, under Illinois law the quit claim deed needed to be recorded in order for the transfer to be effective as to creditors and subsequent purchasers without notice. 765 Ill. Comp. Stat. 50/30.  It would be futile for a party intent on hindering creditors to transfer the property without promptly recording the quit claim deed.

The Debtor disclosed the transfer in his Statement of Financial Affairs filed in his earlier Chapter 13 bankruptcy on October 22, 2013.  However, the Debtor's inconsistent statements in his Chapter 13 bankruptcy schedules and at his Rule 2004

---

[7] The Defendant has not offered an explanation for why the deed was not recorded until nearly two months after it was executed on November 16, 2012.  But neither has the trustee suggested that this delay in recordation is material.

examination may well have served, if anything, to cloud the actual nature of the Debtor's continued interest in the property. For example, contrary to the Defendant's current assertion – and testimony by Jose and Sara at their respective Rule 2004 examinations – that the Defendant leased the DeKalb Property to the Debtor, Jose's bankruptcy schedules do not disclose any lease arrangement between him and his wife, despite his listing other unexpired leases in Schedule G. Even if this omission could impliedly be explained by the Debtor's Rule 2004 examination testimony that the Defendant had "kicked" him "out" of the premises for nonpayment of rent prior to the petition date, such explanation is inconsistent with his scheduling a claim of the Defendant only for "personal loans" but none for "past due rent."

This "explanation" also is inconsistent with the Debtor's scheduling his company DeKalb Auto Sales as operating out of the DeKalb Property in his Chapter 13 Statement of Financial Affairs. Indeed, while disclosing in the schedules filed in that case that the property had been transferred to his wife prepetition, his description in Schedule B of his interest in DeKalb Auto Sales oddly suggests the sole value of the company was the value of the underlying property, as it lists the value of his business interest as $30,000, consisting of the "approximate value of building on property ... $5,000; [and] approximate value of land ... $25,000." (Case no. 13-83596, ECF No. 1, p.10.)

The trustee also argues that the Debtor "concealed the value" of the DeKalb Property by stating its value to be only $30,000 when the Debtor testified at the Rule 2004 examination that as of the time of the petition he was "assuming ... that the

value of the property" was worth "around $40,000." (Jose Depo. 28:10-18.)   The Defendant similarly testified at her Rule 2004 examination that she "kind of assumed that" $40,000 "was the fair market value when [the Debtor] transferred" the property to her. (Sara Depo. 60:21-24.)   The trustee contends that the DeKalb Property may have been worth as much as $125,000 at the time of the transfer, noting for example that the property had been purchased for $125,000 in 2005 and the Defendant had listed it for sale for $129,000 in 2015.

The Defendant disputes that the property was worth that much at the time of the transfer, noting that DeKalb County made a tax assessment of the property valuing it at $81,890 in 2016, and presents examination testimony to argue that the property may have been worth even less as of the date of transfer.   Thus, there also appears to be a genuine dispute as to the precise value of the property as of the date of transfer.   Accordingly, while the Debtor's statements in his bankruptcy schedules regarding he transfer cast some suspicion on the transfer, the court does not find sufficient undisputed proof to establish the presence of "concealment" of either assets or the transfer under 740 Ill. Comp. Stat. 160/5(b)(3), (7).   As discussed below, however, the trustee's failure to demonstrate these badges in the pending motion has been shown to be neither dispositive nor particularly relevant to the issue of the Debtor's fraudulent intent at the time of the transfer.

*Badges 4 and 10: Timing of Transfer with Respect to Debts.*

It is uncontested that creditors had sued the Debtor or threatened him with litigation prior to the transfer of the DeKalb Property.   The Defendant admits that

Bank of America had initiated a foreclosure proceeding in DeKalb County with respect to residential real property at 111 South Ninth Street, DeKalb on April 20, 2010, and had obtained an order of possession on February 16, 2012. (Def. LR 7056-2 Resp., ¶¶ 32-35.)[8]  The Defendant also does not dispute that in 2012 AFC was providing floor plan financing to the Debtor's used car business, that the Debtor had not been making his required monthly floor plan payments to AFC when he transferred the DeKalb Property to the Defendant and that AFC repossessed the Debtor's vehicles on or around December 28, 2012. (*Id.* ¶¶ 36-38.) This repossession occurred between the date of the DeKalb Property quit claim deed and the date the deed was recorded.

The Defendant also admits that the Debtor stopped making payments on his home mortgage to the mortgagee, Chase Bank, in November 2012 at the time he signed the quit claim deed. (*Id.* ¶ 86.)  Sara testified at her Rule 2004 examination that the last payment she and Jose made on the Chase mortgage before the Debtor filed his Chapter 13 petition occurred on November 16, 2012. (*Id.* ¶ 87.)  She testified that the Debtor, in her words, "wasn't having any income" and "we just really having a hard time back then." (*Id.*)  She also testified that the Debtor told her at "[a]bout

---

[8] The Defendant contests the materiality of the foreclosure proceeding, noting that Bank of America had already received an order of possession for the residential property prior to the transfer of the DeKalb Property. The proximity of collection efforts to the transfer date may affect the weight of this badge of fraud depending on the circumstances, but the Defendant has not shown it to be irrelevant. While the Defendant notes that the foreclosure was commenced approximately two and a half years before the transfer, the Defendant does not dispute that the lender obtained the property through that proceeding earlier in the same year as the DeKalb Property transfer. The record before this court is silent as to whether the creditor obtained a deficiency judgment in the foreclosure proceeding at that time. Even if not, the foreclosure is probative as to the Debtor's general financial state and awareness that creditors were pursuing or were likely to pursue him. Indeed, the loss of that property may have led the Debtor to consider what other assets may be vulnerable to creditor collection efforts.

the same time he gave [her] the deed" that he intended to file bankruptcy. (*Id.* ¶ 90.)

Accordingly, the Defendant has failed to raise a genuine dispute over the evidence that the transfer was made after creditors had begun collection efforts, including suit and threat of suit, and after he had defaulted on his obligations to creditors, thus sufficiently demonstrating the presence of the fourth badge of fraud. 740 Ill. Comp. Stat. Ann. 160/5(b)(4).

However, the trustee fails to demonstrate an undisputed factual basis for his additional invocation of the tenth badge of fraud. (Pl. Mem., ECF No. 21, p. 22.) Section 160/5(b)(10) specifies transfers that "occurred shortly before or shortly after a substantial debt was incurred." 740 Ill. Comp. Stat. Ann. 160/5(b)(10). But, notwithstanding the evidence that the Debtor's existing debt relations were souring at this time the trustee does not demonstrate that the debtor had "incurred" the floor plan financing at this time, nor that Jose "incurred substantial debt" at this time.

*Badge 5: Substantially All Assets.*

The Debtor testified at his Rule 2004 examination that the DeKalb Property was the Debtor's most valuable asset as of the time of the transfer. (Defendant's LR 7056-2 Resp., ¶¶ 41.) The Defendant does not dispute this statement. While Sara contends that the Debtor "had other assets of lesser value at the time" the property was transferred, she has not elaborated as to what those "other assets" were or what their value was. (*Id.*) The Defendant herself testified at her Rule 2004 examination that "to [her] knowledge" the Debtor "didn't really have anything else of value to give" her. (*Id.*) Accordingly, it is undisputed that the transaction also bears the fifth badge

of fraud.  740 Ill. Comp. Stat. Ann. 160/5(b)(5).

*Badge 8: Reasonably Equivalent Consideration.*

In his complaint, the trustee alleges that the DeKalb Property may have been worth as much as $125,000 at the time of the transfer in late 2012 / early 2013. (ECF No. 1, ¶ 12.) The Defendant disputes the exact value of the property. Both Sara and the Debtor testified at their respective Rule 2004 examination that they each believed the property was worth $40,000 as of the time of the petition. (Sara Depo. 60:21-24; Jose Depo. 28:10-18.) The Defendant admits that the Debtor had originally purchased the property for $125,000 on or about September 1, 2005. (Def. LR 7056-2 Resp., ¶ 14.) The Defendant admits that as of the time of the transfer, the Debtor was the sole owner of the property and it was unencumbered by any mortgages. (*Id.* ¶¶ 19, 22.) The Defendant admits that she listed the DeKalb Property for sale on June 25, 2015 with a listing price of $129,000 and could to lease the property to a third party on May 1, 2015 for an annual rent of $13,200 per year. (*Id.* ¶¶ 43, 44.)

But, while there may be a dispute as to the precise value of the DeKalb Property, there is no genuine dispute that the Debtor did not receive reasonably equivalent value when he transferred the property to her. Indeed, no admissible proof has been presented to show that the Debtor received any actual value. The Defendant apparently concedes that she did not pay any cash or transfer other assets to the Debtor in return for the property. Instead, she alleges that the transfer was made in partial or complete satisfaction of a debt she claimed Jose owed her. However, she has not offered admissible evidence of that sufficient for any reasonable jury to return

a verdict in her favor on this point.

The Defendant relies primarily on her own proof of claim filed in the Debtor's Chapter 7 case on March 31, 2017, more than three months after the Chapter 7 trustee commenced this adversary proceeding. In this proof of claim, Sara asserts an unsecured claim of $138,396 for "Business loans." She attached to the proof of claim a summary she prepared listing what she contended to be the business loans she made to her husband. For each, she lists a date, an amount, the method of transfer, the purpose and the recipient. This summary includes an alleged $20,000 payment of cash to DeKalb Auto Sales on February 1, 2002 for "Start of the business," a total of $108,429 drawn on the Debtor and Defendant's joint checking account between August 2002 and April 2006 as checks, cash withdrawals or wire transfers, and a total of $8,000 in charges made on the Defendant's Visa credit card between April 2010 and October 2012.[9] However, she has not furnished admissible proof that the purported transfers or payments, even if made, created any legal obligation for the Debtor to repay them, as opposed to being mere gifts or simple reflections of the Debtor's use of joint property.

First, the Defendant admitted at the Rule 2004 examination that she prepared the summary of purported loans attached to her proof of claim by simply going "back and [finding] every possible transfer that [she] made to Mr. Ruvalcaba and put it on this list and then credited rent that [she] received from the real estate subsequent to

---

[9] The summary also includes $23,567.72 in purported loans made after the transfer, which are not relevant to this proceeding. It also includes reductions of $13,200 on May 1, 2015 for "year of rent of property" and monthly reductions of $1,200 from September 2016 through March 2016 for "rent payment."

the transfer." (Sara. Depo. 60:10-15.)    She also admitted that the summary is inconsistent with her assertion that the transfer of the DeKalb Property was in payment or satisfaction of an antecedent debt in that the summary has "no credit … for the value of the real estate that he transferred to" her. (Sara Depo. 7-11.)[10]

The Defendant argues instead that under Bankruptcy Rules the trustee's failure to object to her claim establishes the validity of her purported loan to the Debtor. The trustee responds that there is no deadline to object to the claim and that he may still seek to do so.  The court need not weigh into this argument at this time, since the proof of claim, whatever its evidentiary value, does not establish that the transfer of the DeKalb Property was in payment or satisfaction of a pre-existing debt.

Under the Bankruptcy Rules, a "proof of claim executed and filed in accordance with [the Bankruptcy Rules] shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f).  A claim, proof of which is filed in accordance with Section 501 of the Bankruptcy Code, is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a).  Here the trustee is not contesting the Defendant's claim against the estate or the validity or amount of that claim.  Rather the trustee now argues that the Defendant did not give any value for the transfer of the DeKalb Property in late 2013, a transaction which Sara now claims to be in

---

[10] At oral argument on the motion for summary judgment, the Defendant suggested that the Defendant might not have listed a credit for the property transfer since she may have believed it to be a grant of collateral to support indebtedness rather than an outright transfer.  Defendant's attorney noted that for purposes of the Illinois Uniform Fraudulent Transfer Act, "value is given for a transfer" if in exchange "an antecedent debt is secured." 740 ILCS 160/4(a).  But not only did the Defendant fail to identify any admissible evidence to support this suggestion, but it is contrary both to the form and content of the quit claim deed as a deed rather than mortgage and is contrary to the Defendant's proof of claim in which she asserted no security interest or collateral securing the alleged claim.

satisfaction of an antecedent debt.  However, her proof of claim asserts a debt the Debtor owed to her as of the date of the Chapter 7 petition, in late 2016 and well after the transfer in satisfaction of a supposed debt.

Indeed, the summary Sara attached to her proof of claim lists a number of alleged transactions dated after the transfer.  Moreover, if, as the Defendant argues, she gave value for the DeKalb Property transfer by satisfying an antecedent debt, then the debt so satisfied in late 2012 should not be included in her 2016 claim against the Chapter 7 bankruptcy estate.  And while her filed summary refers to certain alleged pre-transfer loans, Bankruptcy Rule 3001(f) only provides that a properly filed proof of claim constitutes prima facie evidence of the validity and amount of the claim.  The rule does not transform every document attached to a proof of claim into admissible evidence on other issues. *See, e.g., In re Alewelt*, 520 B.R. 704, 710 (Bankr. C.D. Ill. 2014) (evidentiary presumption under Rule 3001(f) does not extend to issue of priority asserted in proof of claim).

Second, the only evidence other than the proof of claim that the Defendant offers in support of her contention that the transfer was in payment of an antecedent debt is her and the Debtor's vague and often inconsistent testimony at their respective Rule 2004 examinations.[11]  But "conclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment." *Bordelon v. Bd. of Educ.*

---

[11] While the Debtor scheduled a $45,000 unsecured claim in favor of the Defendant for "Personal Loans" in his Chapter 13 case schedules, though not in his Chapter 7 case schedules, the Defendant does not and cannot rely on that fact to support her argument.  Like her proof of claim, the Debtor's schedules spoke only as of the date of the petition, not the date of the transfer almost a year before. And like as with her proof of claim, if the transfer was payment of a debt, then the debt paid should not appear in the Debtor's schedules.

*of the City of Chicago*, 811 F.3d 984, 989 (7th Cir. 2016) (quoting *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 726 (7th Cir. 2004)). "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." *Id.* (quoting *Gabrielle M. v. Park Forest–Chi. Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir.2003)). The testimony of the Debtor and the Defendant upon which the Defendant relies as her only evidence of the existence of the purported loans by her to her husband are nothing more than such bald assertions of a general truth devoid of any specifics, and are insufficient to defeat the trustee's motion.

Illinois law "presumes a gift if someone transfers property to his or her spouse or family member." *Barnes v. Michalski*, 925 N.E.2d 323, 337 (Ill. App. Ct. 2010) (citing *Grandon v. Amcore Trust Co.*, 588 N.E.2d 311, 315 (Ill. App. Ct. 1992)).[12] Even if there is an expectation or moral obligation of someone who receives a gift to reciprocate, unless there is a legal right to payment, such obligation or expectation is insufficient to constitute a "debt" for purposes of 740 Ill. Comp. Stat. Ann. 160/4(a). While "debt" and the underlying term "claim" are defined expansively by the statute, the "Act requires the existence of 'a right to payment.'" *A.P. Properties, Inc. v. Goshinsky*, 714 N.E.2d 519, 522 (Ill. 1999) (citing 740 ILCS 160/2(c)). This, "[s]tated simply ... requires a debtor / creditor relationship." *Id.* (finding that under the Illinois

---

[12] Even for a transfer to a nonspouse or nonrelative, where the presumption is the opposite, the initial presumption is that the transfer "was in payment of an antecedent debt" and only if that presumption is rebutted will the law presume the transfer to be a loan. 925 N.E.2d at 337-38.

Property Tax Code "no such relationship [exists] between the landowner and the purchaser of delinquent taxes").

Here, the Defendant now contends that she and her spouse entered into a contractual relationship for her to lend him money. But she has admits in her submissions for the pending cross-motions and testified at her Rule 2004 examination, that there was never any written loan agreement or promissory note between her and her husband. (Def. LR 7056-2 Resp., ¶ 64.)

To be enforceable under Illinois law, an oral agreement "must be sufficiently definite as to its material terms." *Toll Processing Servs., LLC v. Kastalon, Inc.*, 880 F.3d 820, 829 (7th Cir. 2018) (citing *Wait v. First Midwest Bank/Danville*, 491 N.E.2d 795, 801 (Ill. App. Ct. 1986)). There must be "an offer, an acceptance, and a meeting of the minds as to the terms of the agreement." *Id.* (quoting *Bruzas v. Richardson*, 945 N.E.2d 1208, 1215 (Ill. App. Ct. 2011)). For a contract to loan money, the material terms include the amount to be loaned, maturity date of the loan, the interest rate, and the repayment terms. *APS Capital Corp. v. Mesa Air Grp., Inc.*, 580 F.3d 265, 273 (5th Cir. 2009) (citing *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992)). *See also, e.g., First Nat. Bank of Cicero v. Sylvester*, 554 N.E.2d 1063, 1068–69 (Ill. App. Ct. 1990) (material terms of a line of credit agreement "include the intended duration of the agreement; the applicable rate of interest or the basis for ascertaining the rate of interest; the duration or date for maturity of the loans; and the mode or rate of repayment.") (citing *Carrico v. Delp*, 490 N.E.2d 972 (Ill. App. Ct. 1986); *McErlean v. Union Nat'l Bank*, 414 N.E.2d 128 (Ill. App. Ct.

1980)).

Here, the Defendant relies on Rule 2004 examination testimony which fails to evidence that the Debtor and Defendant ever agreed to any material terms with respect to the purported loan. Instead, she points to testimony about a vague promise to repay the amounts 'lent' at some unspecified time in the future. For example, when asked "for her recollection about conversations that [she] had with [her] husband" regarding "anything stated between the two of you that there was going to be a need to repay the money down the road," the Defendant testified that "of course after he was in pain and the money was going long and I didn't have any back, I start pushing to get my money back." (Sara Depo. 28:4-17.)[13]    When asked if there was any discussion about when the Debtor would repay her, she testified:

> A. Hopefully as soon as he could. Fast.
> Q. But was there any discussion about when he was going to repay it?
> A. Before I die I get repaid. I would like to see my money.
> Q. Before you die?
> A. Well, I would like to see my money.
> Q. But was there any discussion about when he was going to repay the money? Any date? Any year? Any term?
> A. Well, when he was able to, he will pay me my money.

(*Id.* 83:9-20.)

Additionally, other than possibly with respect to the alleged loan of $20,000 in

---

[13] The Defendant, in her Rule 7056-2 responses, cites to pages 13, 21-23, 31, 33, 35-37, 64-65, 88, 118, 124-125, 128 of the Debtor's Rule 2004 testimony and pages 21, 24-26, 59, 64-68, 80, 83-84, 100-104, 119-120, of the Defendant's Rule 2004 testimony in support of her denials and additional statements of fact. Courts are "entitled to seek specific guidance through the record" and "the court need consider only the cited materials (though it may consider other materials in the record)." *McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 808-09 (7th Cir. 2017). *See also* Local Rule 7056-2(A)(2) (party opposing summary judgment must respond with "specific references to the affidavits, parts of the record, and other supporting materials relied upon.") "A party opposing summary judgment does not meet this obligation by simply dropping a stack of paper into the court file (literally or electronically) and asserting that someone who reads the stack will find a genuine issue of material fact." *Id.*

cash in February 2002, the Defendant has presented no admissible evidence to show

that there was ever an offer and acceptance of a loan. Instead, her and the Debtor's

Rule 2004 examination testimony showed at most some form of unspoken expectation

that the Debtor would someday return as much of her or their money that he used to

contribute to his business as possible. For example, she testified that the Debtor

"knew he was going to pay me. So he is not going to leave me without paying my

money. He wouldn't do that." (Sara Depo. 25:10-12.) When asked at the examination

if she ever told her husband "you've got to pay me back," she testified that her "brain

works different because I'm not a lawyer," stating to the trustee's counsel:

> I'm pretty sure if you have a relationship with your wife and – you know,
> and you and your wife – you give money to her so she can start her
> business, you probably put it on writing because you're a lawyer so you
> don't want to get stuck with not getting paid. So you probably are beyond
> the faith of the marriage that you have with your wife. That is not how
> it works in my life because I am not a lawyer. I don't – I don't know how
> to put these things together. I am just telling you from my perspective
> this is what happened. Maybe in your case in your life things will
> happen different so maybe you will never be sitting down here what I
> am today because you probably will take all of this precautions, put it
> on writing and put it all together.

(*Id.* 26:16-27:9.)

Of the supposed transactions listed in her proof of claim, the only one she

testified about in any detail about involved her alleged cash transfer of $20,000 to the

Debtor on or about February 1, 2002 to start his new business. (Sara Depo. 65:1-16.)

She testified that she had accrued the cash to give him from her Applebee's

restaurant paychecks. (*Id.* 65:4-6.) She recounted that she "ha[d] a conversation"

with her husband at the time she gave him $20,000. (*Id.* 67:3-5.) But when asked if

the Debtor had agreed to repay her, she instead answered that the date of such conversation was "all the time." (*Id.* 67:9-13.) Pressed further, she testified that "at the time that I give the money, he realize [sic] that he has to pay me. So he knows that he has to pay me." (*Id.* 14-19.)  Only when further asked specifically if her husband "sa[id] 'Yes, I'm going to repay you'?" did she offer an affirmative answer. (*Id.* 67:24-68.)  But she could give no foundation as to when the conversation occurred, other than it "has to be the days before he asked me for the money," and could provide no other details about the conversation or any terms of a supposed agreement. (*Id.* 68:2-5.)

The Defendant presented even less evidence about her other supposed "loans." Of the transactions listed in her proof of claim which predate the transfer, two are apparently for someone's use of the Defendant's Macy's credit card and the rest are for checks drawn on or money withdrawn from Sara and the Debtor's joint checking account. With respect to the Macy's Visa card, the Defendant has not offered evidence showing who used the card or that prior to such use the Debtor agreed to repay the Defendant the amount charged.  Similarly, the Defendant has not shown that she was the sole owner of funds in the joint account or that prior to using funds in the joint account the Debtor agreed to repay the Defendant for the use.

In Illinois, when "a joint tenant of a bank account deposits funds into the account, the presumption is that he or she does so with the intent to make a gift of those funds to the other joint tenant." *Tummelson v. White*, 47 N.E.3d 579, 585 (Ill. App. Ct. 2015) (citing *Rasmussen v. LaMagdelaine*, 566 N.E.2d 864 (Ill. App. Ct.

1991)). This presumption of gift "can be rebutted only by clear and convincing evidence that the joint account actually was a convenience account, *i.e.*, 'an account that [was] nominally a joint account, but [was] intended to allow the nominal joint tenant to make transactions only as specified by, and on behalf of, the account's creator.'" *Id.* (internal citations omitted) (quoting *In re Estate of Shea*, 848 N.E.2d 185 (Ill. App. Ct. 2006)). As the court in *Tummelson* explained, as "far as the law is concerned, making a deposit into a joint account (which is not a convenience account) is the same as handing the money to the other joint tenant as a gift." 47 N.E.3d at 586 (citing *Frey v. Wubbena*, 185 N.E.2d 850 (Ill. 1962)).

The Defendant has not shown there to be a genuine dispute that the joint account was a "convenience account." She did testify that she generally deposited her paychecks into the joint bank account. (Sara Depo. 64:19-24.) But she also testified that her husband also regularly deposited funds into the joint account for the purpose of paying their household expenses. (*Id.* 71:12-14.) She did not dispute that the Debtor's deposits into this account by the Debtor were significant. Indeed, the Debtor testified that on a monthly basis he would deposit money to pay about 80% of their expenses, including their mortgage, utilities and groceries, and totaling "around between $2,500 to $3,000" per month. (Jose Depo. 43:7-16; 126:20-127:11.) The Defendant admitted that both she and her husband could sign checks on the account. (Sara Depo. 69:24-70:5)   The Debtor testified that he did not pay personal bills through his business account, but only expenses of the business. (Jose Depo. 127:12-19.) In sum, the Defendant has not identified admissible evidence which would

overcome the presumption arising from the undisputed record that the Debtor had

the right to use the funds in the joint checking account without a legal obligation to

repay her.

With respect to the checks written on and withdrawals made from the joint

checking account which the Defendant now alleges to be 'loans,' Sara was unable to

recall any specific conversations she had with her husband regarding them. For

example, with respect to a $19,000 check she alleges the Debtor made to DeKalb Auto

Sales from the joint checking account on or about January 9, 2004, she testified:

> A. As I say, if he ask me, I say yes, and then he get the money.
> Q. Is that as specific as you can get?
> A. Yes.
> Q. Is that pretty much as specific as you can get about all of these transactions?
> A. Yes.
> Q. "If he asked me for the money, I'd give him the money"?
> A. Yes.

(Sara Depo. 96:12-21.)  Later she testified:

> A. As I said, all the money that was in the account is all the money that
> he had.
> Q. So he just drew out the check and told you he had drawn the check?
> A. That's all. I didn't have no more money. If I had more money, I would
> give him more money.

(*Id.* 97:17-22.)  At best, her testimony suggests that there was some form of general

understanding or agreement that the Debtor would use money she deposited into

their joint account towards his business, in the hope that when the business was later

successful he could replenish their savings or pay her back. As she testified, with no

details as to any specific conversation, "we have an agreement since the beginning

that everything would be going to his business and at some point he will pay me. He

will give me my money back. So I – every time that he needed money, he will come

and ask. And he will get as much as I already have saved in that account. So if I have

$21,000 in the account, he will probably withdraw $21,000 of the account. But this is

all that I have. This is all that he could have." (*Id.* 96:1-10.)   But this sort of

'agreement' with no specified terms or obligations is not shown to be anything more

than an understanding between a married couple or permission granted one's spouse

to invest their joint savings in a way that will hopefully benefit the whole family.

That their understanding was of this sort rather than a contractual agreement

is also demonstrated by her admission that there was no specific time or obligation

for the Debtor to repay or replenish the amounts he used.   Not surprisingly, the

Defendant does not explain how such an understanding or permission, without more,

creates a legally enforceable right to payment, the satisfaction of which would

constitute value under the Illinois Uniform Fraudulent Transfer Act.[14]

Such generalized hopes of repayment are insufficient to demonstrate an

enforceable contract was formed, particularly where it is presumed that the Debtor

had free use of joint property and the Defendant's contributions were a gift.

---

[14] The Defendant has also argued that she obtained certain funds she transferred to or for the benefit of the Debtor from a so-called "Tanda" that she participated in with her mother-in-law and certain other individuals.  But the Defendant has not shown that she borrowed funds from the Tanda in a way that the Debtor's use of funds she contributed to the joint account could be seen as a loan from the Tanda.  To the contrary, she testified that she simply used the Tanda as a way to hold some of her savings before or after she deposited her paychecks into their joint checking account.  When asked if a lot or most of the money she transferred to the Defendant "was loaned from tanda," the Defendant testified, "No. It's my money. It's my money. It's my work. It's not how – it's not how it works." (Sara Depo. 113:10-15.)  She further testified that "what [she] drew down from tanda was money that [she] put into tanda." (*Id.* at 113:16-18.)  The fact that she may have at some point invested funds into the Tanda is therefore irrelevant to whether the Defendant and the Debtor had an enforceable agreement for the Debtor to repay her funds she transferred to or on his behalf.

Additionally, the trustee has identified evidence that both the Debtor and Defendant have acted in numerous ways which are inconsistent with her position that she had lent the Debtor money prior to the transfer of the DeKalb Property or that the transfer was in payment of any such debt. In the Debtor's Chapter 13 bankruptcy schedules, he describes the transfer of the DeKalb Property to the Defendant as for "Value received $0.00." The deed itself states that it is "for and in consideration of Ten and no/100 ($10.00) Dollars and other good and valuable consideration in hand paid" and the Debtor signed the deed certifying that it was "Exempt under provisions of Paragraph e Section 4, Real Estate Transfer Tax Act." The reference to the transfer tax pertains to the statute's exemption for "Deeds or trust documents where the actual consideration is less than $100." 35 Ill. Comp. Stat. 200/31-45(e).[15] The Defendant's itemization attached to her proof of claim deducts "payments" of certain rent received from the property, but makes no deduction for the purported value given through the transfer of the DeKalb Property. While the Debtor had listed the Defendant as having a $45,000 claim for "Personal Loans" in the earlier Chapter 13 case, the Defendant never filed a proof of claim in that case. The opposite occurred in the Chapter 7 case, in which while the Debtor did not schedule his spouse as a creditor, the Defendant filed a proof of claim after the trustee commenced his action to avoid the property transfer to her.

Accordingly, we find there is no genuine issue of the facts that demonstrate

---

[15] The Defendant argues other tax exemptions may have been applicable. But the issue is not whether the transfer was in fact exempt from taxation. Rather, by certifying that the transfer qualified for the specified exemption, the Debtor indicated his belief that the actual consideration for the transfer was less than $100.

that the property transfer at issue is marked by the eighth badge of fraud. 740 Ill. Comp. Stat. Ann. 160/5(b)(2).

*Badge 9: Insolvency.*

The Illinois Uniform Fraudulent Transfer Act defines insolvency as the condition where "the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." 740 Ill. Comp. Stat. 160/3(a). In the Debtor's schedules filed on October 22, 2013 in his prior Chapter 13 case, he scheduled total assets of $294,556.51 and total liabilities of $466,121.46. The Debtor testified at his Rule 2004 examination that his financial condition was substantially the same in October 2013 as when he transferred the property to his wife in November 2012. (Jose Depo. 97:13-23.) The Defendant denies that the statements by the Debtor in his bankruptcy schedules and Rule 2004 examination are "binding on her," but has stated only that she is "unable to confirm or dispute the veracity of the subject statements" and has provided no evidence to contradict them. (Def. LR 7056-2 Resp., ¶¶ 81-82.) She therefore fails to raise a genuine dispute that the Debtor was insolvent as of the time of the transfer.

Additionally, a "debtor who is generally not paying his debts as they become due is presumed to be insolvent." 740 Ill. Comp. Stat. 160/3(b). The trustee has established that there is no genuine dispute that the Debtor was generally not paying his debts as they became due as of the time of the transfer. The Defendant admits that the Debtor had not been making his required monthly floor plan payments to AFC as of the time of the transfer. (*Id.* ¶ 38.) Additionally, the Debtor testified at his Rule 2004 examination that in November 2012 he was having "a lot of problems" with

his business and that he "had some bills [he was not] able to pay." (*Id.* ¶ 83 (citing Ex. D. 55:9-14.))[16]

The Defendant has not pointed to any admissible evidence to overcome the established presumption that the Debtor was insolvent as of the time of the transfer. To the contrary, the Defendant testified at the Rule 2004 examination that she was not aware of "anything else of value" that the Debtor had to give her as of the time of the transfer other than the DeKalb Property. She also testified that the Debtor told her at the time of the transfer that he intended to file bankruptcy. Although he did not in fact file his Chapter 13 petition until October 2013, the Defendant has not pointed to any change in financial circumstances between the transfer and the petition to show his assets exceeded his debts as of the time of the transfer. Accordingly, the record demonstrates the undisputed presence of the ninth badge of fraud in the property transfer. 740 Ill. Comp. Stat. Ann. 160/5(b)(9).

## *Fraudulent Intent*

Based on the foregoing, there is no genuine dispute that the transfer of the DeKalb Property bears at least six badges of fraud and the Defendant has failed to present admissible evidence from which any reasonable jury could find that the Debtor did not transfer the property to the Defendant with the intent to hinder, delay, or defraud creditors. In *Baldi v. Discepolo (In re: A1 Millennium Marina, Inc.)*, the

---

[16] The Defendant disputes this allegation, stating that "the cited portions of Jose's deposition transcript relate to an unpaid mortgage obligation foreclosed in early 2010. (*Id.* 83.) While the trustee did cite additional testimony on page 104 of the transcript relating to the mortgage, the testimony cited on page 55 is not limited to or in the context of that mortgage.

court found that the undisputed presence of four badges of fraud, §§ 160/5(b)(1) (to

insider), (4) (suit or threat of suit), (5) (substantially all assets), and (9) (insolvency),

was "adequate to support an inference or presumption that the [debtor] transferred

money to Defendants with the actual intent to hinder, delay, or defraud the [debtor's]

other creditor." No. 13 C 8676, 2016 WL 1161278, at *9 (N.D. Ill. Mar. 23, 2016). The

court found that the debtor's president's deposition testimony that he "subjectively

considered the [debtor's] debts to insiders as more important than the debts owed to

[other creditors] has minimal bearing on the issue of whether [the defendant] acted

with 'actual intent under § 160/5(a)(1)'" and therefore granted summary judgment in

favor of the plaintiff. *Id. See also Kunz v. City of Chicago*, 2007 U.S. Dist. LEXIS 7958

(N.D. Ill. Jan. 31, 2007) (granting summary judgment in favor of plaintiff based on

undisputed presence of seven badges of fraud, and finding defendants' purported

explanation for the transfer "patently unbelievable"). *But see, e.g., Barber v. Grube

(In re Grube)*, 462 B.R. 663 (Bankr. C.D. Ill. 2012) (finding issue of fact based on

debtor's denial of scienter in Debtor's declaration, corroborated by attorney's letter,

warranted denial of summary judgment despite presence of eight badges of fraud).

Nor is the Defendant's assertion that the transfer was in payment of an

undocumented loan – an assertion supported only by her and her husband's vague

and contradictory deposition testimony – sufficient to create a genuine issue of

material fact as to the Debtor's fraudulent intent. Similarly, in *DeMars v. Danciu (In

re Pop)*, the court granted summary judgment in favor of the Chapter 7 trustee on a

fraudulent transfer count brought under Bankruptcy Code Section 548(a)(1)(A) based

on the undisputed presence of badges of fraud including that the transfer was to an insider, was for no consideration, and was made after suit or threat of suit. 2007 Bankr. LEXIS 1919 (Bankr. N.D. Ill. May 24, 2007). As in the instant case, the *DeMars* court found that the defendant's asserted explanation was insufficient to overcome the inference of fraud or create a genuine issue of material fraud where the debtor and his wife transferred real estate property to the wife's parents after several judgments were entered against the debtor and less than one year before he filed bankruptcy. The defendants in that case argued that they had been the true owners of the property prior to the transfer because they had contributed funds towards its purchase and improvement and an alleged earlier unrecorded quit claim deed which the debtor's wife claimed she and the debtor had signed several years before the transfer. The court found that the defendants' assertion, supported only by an affidavit of the debtor's wife, was insufficient to create a genuine issue when the overwhelming "indicia of ownership point[ed] to" the debtor and his wife as of the time of the transfer. *Id.* Those indicia included that the debtor and his wife had recorded title at the time, took out a mortgage representing to the bank that they owned the property, and treated the property as their own in their joint tax returns. *Id.* Here, too, the Defendant's vague and unsupported deposition testimony, which is contradicted by her and the Debtor's other testimony, the Debtor's bankruptcy schedules and the Defendant's own proof of claim, is insufficient to create a genuine dispute that the transfer was not for reasonably equivalent consideration and was made with fraudulent intent.

**B.    Constructive Fraud.** A transfer is also "fraudulent" for purposes of the Illinois Uniform Fraudulent Transfer Act as to a past or future creditor if the debtor made the transfer "without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or  (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." 740 Ill. Comp. Stat. Ann. 160/5(a)(2). Additionally, under Section 160/6 of the Act a transfer is fraudulent solely as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor "was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." 740 Ill. Comp. Stat. Ann. 160/6(a). For these purposes the Act defines insolvency as "the sum of the debtor's debts [being] greater than all of the debtor's assets at a fair valuation," with a presumption of insolvency where the debtor "is generally not paying his debts as they become due." 740 Ill. Comp. Stat. Ann. 160/3(a), (b).

As discussed in the previous section, the trustee has met his burden of demonstrating for purposes of summary judgment that the Debtor did not receive a reasonably equivalent value in exchange for the transfer of the DeKalb Property to the Defendant. Sara does not dispute that she did not transfer any money or other property in exchange for the DeKalb Property. While she contends that she gave

value by allegedly recognizing the satisfaction of an antecedent debt, she failed to meet her burden of identifying evidence from which a jury could find such debt existed in the first place, or that it equaled or exceeded the value of the transferred property.

Also, as discussed above, the trustee has demonstrated that there is no genuine dispute that the Debtor was insolvent as of the time of the transfer. In his bankruptcy schedules filed in October 2013, the Debtor listed liabilities greater than his assets. The Debtor testified at his Rule 2004 examination that his financial condition was substantially the same at the time of the transfer and the Defendant has identified no evidence to the contrary. In addition, there is no genuine dispute regarding the trustee's proof that the Debtor was generally not paying his debts as they become due. Under the Illinois Uniform Fraudulent Transfer Act, this creates a presumption of insolvency, which the Defendant failed to rebut. 740 Ill. Comp. Stat. 160/3(b).

Finally, the Plaintiff has demonstrated that there is no genuine dispute that at the time of the transfer the Debtor was engaged in business for which the remaining assets of the debtor were unreasonably small. It is undisputed that at the time of the transfer, neither the Debtor nor his wholly-owned company was able to make the required monthly payments for his company's automobile floor plan financing and that the lender was in the process of repossessing his inventory. It is also uncontested that the transferred property was his most valuable asset and that he did not have other liquid assets from which he or his company could make such payments. Indeed, the Defendant admits that the Debtor told her at the time of the transfer that he intended to file for bankruptcy protection.

Accordingly, there is no genuine issue of material fact, and the Plaintiff is entitled to summary judgment on Counts II and III of the complaint.

*Remedy.*

Through Count V, the Plaintiff seeks to recover for the benefit of the estate either the DeKalb Property itself or the value of the property. 11 U.S.C. § 550(a)(1). Section 550(a) gives the bankruptcy court "discretion to decide whether to order recovery of the property or recovery of its value." *In re Veluchamy*, 879 F.3d 808, 822 (7th Cir. Jan. 12, 2018). The Bankruptcy Code offers little guidance on how to exercise such discretion, other than making clear that the options are in the alternative. *See* 11 U.S.C. § 550(d) ("The trustee is entitled to only a single satisfaction under subsection (a) (of this section."). One court, cited with approval in *Veluchamy*, stated generally that the "purpose of § 550 is to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred.... The primary goal is equity and restoration, i.e., putting the estate back where it would have been but for the transfer." *In re Keeley & Grabanski Land P'ship*, 531 B.R. 771, 777 (B.A.P. 8th Cir. 2015), aff'd, 832 F.3d 853 (8th Cir. 2016) (quoting *Decker v. Tramiel (In re JTS Corp.)*, 617 F.3d 1102, 1111–12 (9th Cir.2010)). Another court within this Circuit has explained:

> Generally, where the record contains no or conflicting evidence of the market value of the transferred property, the courts have ordered that the property be returned. Where the property is unrecoverable or its value diminished by conversion or depreciation, courts will permit the recovery of value. However, if the market value of the property can be readily determined and would work a savings for the estate, the trustee may recover value rather than the property. The market price at the time of transfer is the proper measure of § 550 damages.

*In re McLaughlin*, 183 B.R. 171, 176–77 (Bankr. W.D. Wis. 1995) (internal citations and quotation marks omitted).

Count V as pleaded seeks in the alternative the turnover of the property or a monetary judgment of $125,000 without articulating a preference for either. Here, the property appears to still be owned by the Defendant, though as of the date of the trustee's motion, it was unclear from the record the condition of the property or if it is being leased. The parties dispute the precise value of the property as of the time of the transfer, and even the trustee has suggested nothing more precise than a range of possible values, pointing to various valuations made at different times for different purposes.

In its preliminary bench ruling on the motions on April 25, 2018, the court noted that there appeared to be a factual issue as to whether to order the turnover of the property or to enter a money judgment and, if the latter, what the amount of the judgment should be. Relying on Rule 56(g), the court indicated its inclination to deny summary judgment in favor of the trustee on Count V, stating that on this point remains disputed material facts as to an item of damages or other relief, while preserving its oral ruling that no genuine issue exists as to the underlying factual predicate for liability on that Count. Accordingly, the court ruled then that the Defendant is liable under Count V for the avoided transfer of the DeKalb Property and continued the matter for further proceedings as to the appropriate remedy.

Before the conclusion of that hearing the trustee stated that he seeks the property itself, via either a turnover judgment or a judicial deed, and disclaims his

request for a monetary, thereby eliminating the need for further hearing. The Defendant's attorney declined at that time to state her position on the election of remedy, and instead asked the court for an opportunity to consider the court's ruling and the trustee's proposal. Accordingly, the court took the issue of Count V's remedy under advisement, and allowed the trustee to file a proposed order consistent with the court's oral ruling. The court further granted the Defendant leave to file her response, if any, after the trustee's filing and no later than May 7, 2018. The proposed order filed by the trustee two days later provides for the transfer of the Defendant's right, title and interest in the DeKalb Property pursuant to 11 U.S.C. § 550(a) without requesting money damages, thereby abandoning his alternative claim. The Debtor filed no response. During the status hearing held on May 16, the trustee confirmed his intent to seek only the turnover of the Property. When asked during that hearing whether the Defendant wished to raise any objection to the proposed turnover judgment, the Defendant declined to do so beyond requesting that entry of the judgment order be delayed until counsel and his client had reviewed this Memorandum Opinion. Concluding that the Defendant had had ample opportunity to already consider the trustee's election of remedy for Count V, the court denied the Defendant's request.

Accordingly, the court finds that the Debtor has demonstrated that there is no genuine issue of material fact for the turnover of the property, and summary judgment will be entered in his favor and against the Defendant as to Count V for the turnover of the DeKalb Property.

## CONCLUSION

The court will therefore enter judgment in favor of the Plaintiff on Counts I,
II, III and V finding the Defendant liable for the fraudulent transfer of the DeKalb
Property and ordering the turnover of the DeKalb Property to the estate.  A separate
order shall be entered giving effect to the determinations reached herein.

DATE: May 17, 2018

ENTER:

Thomas M. Lynch
United States Bankruptcy Judge